FILED

JUL 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DWAYNE CASSELL,                         :
                                        :
            Petitioner,                 :     Criminal No.:   00-270 (RMU)
                                        :     Civil No.:      03-1914
        v.                              :     Document No.:   47
                                        :
UNITED STATES OF AMERICA,               :
                                        :
            Respondent.                 :

**MEMORANDUM OPINION**

**DENYING THE PETITIONER'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

**I. INTRODUCTION**

On December 8, 2000, the petitioner, Dwayne Cassell, was convicted by a jury of possession with intent to distribute cocaine base (count 1), possession with intent to distribute cocaine base within 1,000 feet of a school (count 2), possession of a firearm during a drug trafficking offense (count 3), and possession of a firearm and ammunition by a convicted felon (count 4). On March 7, 2001, the court sentenced the petitioner to 288 months of incarceration. On September 9, 2003, the petitioner filed the instant motion for relief under 28 U.S.C. § 2255, arguing that the prosecutor had allowed false evidence to go to the jury and engaged in improper witness vouching in his closing argument, and that the petitioner's counsel was constitutionally ineffective. Because the petitioner has failed to demonstrate prosecutorial misconduct, ineffective assistance of counsel, or actual prejudice resulting from either claim, his motion to vacate, set aside, or correct his sentence is denied.

## II. BACKGROUND

### A. Factual Background

#### 1. The Search, Arrests, and Grand Jury Proceedings

On July 13, 2000, officers of the Metropolitan Police Department ("MPD") executed a

search warrant of a home, where the petitioner resided with his uncle, Lawrence Hart, located at

1129 Trinidad Avenue in Northeast, Washington, D.C. The search warrant team, led by seizing

officer Norma Horne, seized the following items, among others:

1. A brown bag containing 71 ziplock bags and containing a total of 17 grams of crack cocaine, a 9 mm. bullet, a .32 caliber bullet, and a bill and court document in the petitioner's name, were found in a hutch on the dining room table. Trial Tr. at 233-34, 490,

2. A large rock of cocaine base wrapped in a towel, worth approximately $11,500, with marijuana beside it, were found on the top of the refrigerator in the kitchen. *Id.* at 236-37, 258-59, 490,

3. A magazine for a semiautomatic handgun, a scale, and a car purchase receipt in the defendant's name, were found in a box on a chair on the rear porch. *Id.* at 203-06, 207-08,

4. A dinner plate bearing the petitioner's fingerprint and cocaine crumbs were found on the same chair on the rear porch. *Id.* at 209, 292-94, 299, 464-65, 473,

5. Marijuana, a .32-caliber loaded revolver, .22 caliber ammunition, and $750 in U.S. currency were found in Lawrence Hart's upstairs bedroom. *Id.* at 227-28, 230-33, 246-48,

6. Marijuana was found in a plastic bag inside a medicine cabinet in an upstairs bathroom. *Id.* at 225-26, 273,

7. A Cobray 9 mm. loaded pistol and a Colt AR-15 A2 loaded rifle were found under a duffle bag at the edge of the bed in the petitioner's bedroom. *Id.* at 215-18, 282-88,

8. A total of $3,154 in U.S. currency was found in the petitioner's bedroom. *Id.* at 221-25.

Hart, who was present during part of the search, was carrying $1,429 in cash on his

person. *Id.* at 247, 372-73. After the search, Hart was arrested and spent the night in jail. *Id.* at

376-77. Mr. Hart admitted ownership of the loaded .32 caliber firearm, the $750 in U.S.

currency and the marijuana found in his room. *Id.* at 373-74. He explained that he was going to

use the money to buy a big-screen television. *Id.* He later pled guilty to a single misdemeanor

gun offense in exchange for his cooperation against his nephew. *Id.* at 377-79. Hart provided

testimony to the grand jury concerning the petitioner. Pet'r's Mot., Ex. 1. At one point, Hart

falsely testified that he had no previous criminal history before pleading guilty to the gun

offense.[1] *Id.* at 28. In truth, Hart had previously been arrested for drug violations, gun-related

violations, attempted petit larceny, attempted housebreaking, and destruction of property. Pet'r's

Mot., Ex. 3 (MPD Criminal History Record). Of these arrests, Hart had been convicted of

attempted housebreaking, attempted petit larceny, and destruction of property. *Id.* All of these

arrests and/or convictions occurred before 1972. *Id.* On August 24, 2000, the petitioner was

indicted for charges relating to the drugs and firearms seized at 1129 Trinidad Avenue.

Two months later, the petitioner was arrested on September 8, 2000. Upon his arrest, he

gave a videotaped statement in which he discussed with detectives a murder unrelated to the

charges for which he had been arrested. Resp't's Opp'n, Ex. A. at 28 (Transcript of Videotaped

Statement of Dwayne Cassell on September 9, 2000). When asked whether his uncle would

know if he had been at home on a certain day, the petitioner stated that his uncle was "very

upset" with him because of the "coke and the guns" found by police, *id.* at 29, and for this

reason, further stated:

> I think my uncle – to tell the truth – you know what I'm saying? – he mad at me .
> . . he might say anything . . . Because my uncle, man, he want to see me

---

[1] Hart testified to the grand jury, in pertinent part:

Q: Mr. Hart, prior to pleading guilty to the .32 caliber pistol that you plead guilty
to-
A: Right.
Q: -did you have any criminal record??
A. No, no.

Pet'r's Mot., Ex. 1 at 28 (Grand Jury Testimony Transcript of Lawrence Hart).

(inaudible) because the shit that went down – that federal shit you talking about? .
. . The coke and the guns and shit, yeah, yeah – he very upset . . . So he might . . .
say some bogus stuff . . . trying to get revenge back on me.

*Id.*

Later in the interrogation, the petitioner discussed Sursum Corda – the neighborhood the

petitioner lived in with his uncle – and how recent events there had interfered with his ability to

"make his money":

> [d]idn't nobody never come outside. Everybody think somebody going to shoot
> Little Dink[.] . . . So every time the police come around, they don't see nobody
> out there. That joint empty, you know what I'm saying? That's when everybody
> – all my friends, they got scared, stopped coming over there, sending me little
> stuff, just chilling. After that I was easing past there late night just – you know
> what I'm saying – make my money. All my other friends, it took them one hell of
> while for them to come out to the Corda. It took them the beginning of summer
> to come back, for real – to come back to the Corda. That joint was shut down for
> real . . . and Little Dink family – then they calling the police – calling the police
> on us anyway. So we got tired . . . Can't – man, we can't make no money and
> shit.

*Id.* at 49-50.

## 2. The Trial

The petitioner's trial began on December 4, 2000. The petitioner was represented at trial

by Valencia R. Rainey of the Federal Public Defender Service. At trial, Ms. Rainey asserted

both during her opening argument and during cross-examination of government witnesses that

the firearms seized from the defendant's bedroom belonged to Hart. Trial Tr. at 186-190, 278,

399-448. According to testimony elicited from Hart at trial by the government, Hart is a 51-

year-old resident of the District of Columbia who, by the date of the search, had lived in the

house in question for seven years. Trial Tr. at 358, 361. For the past seventeen years, Hart had

worked full-time, first at the Navy Annex and then at the Department of Justice copy center. *Id.*

at 359. The petitioner had lived in Hart's home for about two and a half years prior to the date

of the search. *Id.* at 361-62. The petitioner did not have a job while he stayed with his uncle, although he occasionally purchased cars at auctions and re-sold them. *Id.* at 364, 432.

Hart testified at trial that on a previous occasion three or four months before the search, Hart had kicked the defendant out of his house after he had returned early from work one day and observed his nephew and another man with a white material that smelled like crack. *Id.* at 381-87. Hart further testified that he allowed the defendant to return a week later after warning him not to keep drugs in the house. *Id.* at 387-89. Hart also testified that he had seen the defendant on another occasion leaving the house with tiny ziplock bags that he assumed contained cocaine, *id.* at 389-91, and discovered a measuring cup in the sink that made him feel the defendant was "doing something," *id.* at 392-94.

The jury also heard from numerous law enforcement officials, including Officer Horne, who identified the location of the items seized during the search of the petitioner's home. *E.g.,* *id.* at 194-97. Detective Tyrone Thomas, a drug operations expert, testified that drug dealers keep firearms to "protect their drug operations" from rival dealers and people seeking to rob them. *Id.* at 486. Detective Thomas also testified generally as to how crack cocaine is manufactured and packaged. *Id.* at 483-85. Officer Lawrence Powell and Agent Joseph Bigbee of the Bureau of Alcohol, Tobacco and Firearms identified the two firearms found in the petitioner's bedrooms as a Colt AR-15 A2 semiautomatic rifle made by Colt industries and a Cobray 9-millimeter semiautomatic pistol. *Id.* at 284-86, 349-52. Barbara Evans, a fingerprint specialist for the MPD, testified that the print on the dinner plate matched the right thumb-print of Dwayne Cassell. *Id.* at 464-67. Finally, the jury viewed a redacted version of the videotaped statement taken from the petitioner after he was arrested. *Id.* at 530.

Petitioner's counsel brought motions pursuant to Federal Rules of Evidence 609 and 404(b) to impeach Hart with his prior convictions, all of which were denied.  The government rested its case on December 7, 2000.  The petitioner rested without introducing any evidence.  On December 8, 2000, the jury convicted the petitioner of counts 1-4, and acquitted him of count 5 (possession of marijuana).  On March 7, 2001, the court sentenced the defendant to 288 months of incarceration.

The petitioner filed a timely notice of appeal, arguing that the admission of evidence of his prior firearm possessions violated Rules 404(b) and 403 of the Federal Rules of Evidence.  On June 11, 2002, these judgments were affirmed by the United States Court of Appeals for the District of Columbia.  *Cassell v. United States*, 292 F.3d 788 (D.C. Cir. 2002).  The petitioner filed the current motion to vacate, set aside, or correct sentence, on September 9, 2003.  The court now turns to this motion.

## III. ANALYSIS

### A. Legal Standard for Motions under § 2255

A person may challenge the validity of his sentence under 28 U.S.C. § 2255 by moving the court that imposed the sentence to "vacate, set aside, or correct the sentence."  28 U.S.C. § 2255; *see also Daniels v. United States*, 532 U.S. 374, 377 (2001); *Wilson v. Office of Chairperson, D.C. Bd. of Parole*, 892 F. Supp. 277, 279 n.1 (D.D.C. 1995) (holding that "it is well settled in this jurisdiction and elsewhere that § 2255 will lie only to attack the imposition of a sentence and that an attack on the execution thereof may be accomplished only by way of habeas corpus in the district of confinement") (quoting *Hartwell v. United States*, 353 F. Supp. 354, 357-58 (D.D.C. 1972)).

Section 2255 authorizes the sentencing court to discharge or resentence a prisoner if the court concludes that it was without jurisdiction to impose the sentence, the sentence was in excess of the maximum authorized by law, or the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (noting that "[t]his statute was intended to alleviate the burden of habeas corpus petitions filed by federal prisoners in the district of confinement, by providing an equally broad remedy in the more convenient jurisdiction of the sentencing court") (citing *United States v. Hayman*, 342 U.S. 205, 216-17 (1952)). A petitioner can collaterally attack his sentence under § 2255 where the sentencing judge made an "objectively ascertainable error." *King v. Hoke*, 825 F.2d 720, 724-25 (2d Cir. 1987) (citing *Addonizio*, 422 U.S. at 187).

The person seeking to vacate his sentence shoulders the burden of sustaining his contentions by a preponderance of the evidence. *United States v. Simpson*, 475 F.2d 934, 935 (D.C. Cir. 1973); *accord Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000). Relief under section 2255, however, is an extraordinary remedy. *Addonizio*, 442 U.S. at 184; *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992).

### B. The Prosecutor's Statements in Closing Argument Were not Serious Errors and Were not Prejudicial to the Petitioner

The petitioner argues that certain statements made by the prosecutor during his closing argument constituted serious errors that prejudiced the petitioner's defense. Pet'r's Mot. at 12-17. Because the petitioner failed to raise this argument on direct appeal, he may raise this claim collaterally (that is, pursuant to § 2255) only if he can (1) demonstrate good cause for his failure

to raise the issue on appeal, and (2) show that the issue he is raising caused actual prejudice. [2]

*Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 622

(1998); *United States v. Kleinbart*, 27 F.3d 586, 590 (D.C. Cir. 1994).

The petitioner's claim centers on the false testimony given to the grand jury by Lawrence

Hart concerning his criminal history.  The relevant portion of the prosecutor's closing argument

that the petitioner complains of is as follows:

> [b]ut you know what?  You know what?  Mr. Hart has paid the price for that
> because Mr. Hart *now* has a criminal record.  Mr. Hart has plead guilty across
> the street to possessing that pistol.  After 17 years of hard work for the Navy Annex
> and for the copy center that he's working in right now, Mr. Hart *now* has a
> criminal record.

Trial Tr. at 603 (emphasis added).

The petitioner argues that this statement constituted a false assertion to the jury that Mr.

Hart had no previous criminal record prior to pleading guilty to the handgun charge.  Pet'r's

Mot. at 15.  In addition, the petitioner argues that, despite knowing about Hart's previous record,

the prosecutor "engaged in the worst sort of improper witness vouching" by describing Mr. Hart

in his closing statement to the jury as a "hard-working, peace-and-law abiding, and truthful

citizen who had never been in trouble with the law before." *Id.* at 13.  In pertinent part, the

prosecutor said the following:

> [l]adies and gentlemen, when you go back into the jury room to decide who it was
> that possessed these things, was it Mr. Cassell or was it Mr. Hart, I want you to
> think on these words if you remember anything about my closing argument at all.
> Picture Lawrence Hart on a street corner in Sursum Corda with *this* slung over his
> shoulder peddling crack cocaine.  I told you when I opened at the beginning of

---

[2] Although ineffective assistance of counsel may demonstrate cause and prejudice, *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986), the claim of ineffective assistance is not itself forfeited if not raised during appeal. *Massaro*, 538 U.S. at 504. The petitioner alleges ineffective assistance of counsel at his trial, but also asserts ineffective counsel at the appellate stage as *cause* for procedurally defaulting on his claim of prosecutorial misconduct. Pet'r's reply at 2, n.1. For the reasons that follow, assuming *arguendo* that the petitioner's counsel was ineffective at the appellate stage, the petitioner was nonetheless not prejudiced by the prosecutor's conduct.

this trial that the essential reason why you are not going to be able to find Mr. Hart to be an incredible witness or the possessor of these things is that once you saw Mr. Hart, the idea of him carrying this weapon around would seem ludicrous to you. And I submit to you that it must be ludicrous to you that the 51-year-old man who's worked in the copy room for four years, the Navy Annex doing microfiche for 13 years before that, works 40 hours a week from 10:00 to 7:00 comes home at 7:00 at night, straps on this AR-15, goes down to Sursum Corda and peddles crack cocaine.

Trial Tr. at 603-04 (emphasis added). The prosecutor continued:

[a]nd when you go back in the jury room, again the image that I want you to maintain is that 51-year old man on a street corner in Sursum Corda protecting his street corner so that he can sell his crack cocaine, it is a ludicrous, ludicrous image, and what you're thinking about whether Lawrence Hart possessed this gun or not, you think about him strapped on a street corner selling drugs. And if you can do that without smiling, without smirking, without bursting out laughing at just the sheer preposterousness of that image, then I would be very surprised.

*Id.* at 631.

For a prosecutor's statements in closing argument to warrant vacating a sentence, those statements must "entail a serious error that is prejudicial to the defendant." *United States v. Earle*, 375 F.3d 1159, 1163 (D.C. Cir. 2004). In determining whether the petitioner suffered actual prejudice, the court looks to three factors: (1) the severity of the prosecutor's misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the improper remarks. *Id.* at 1165. While it is a serious error "for counsel to make statements in closing argument unsupported by evidence," *United States v. Watson*, 171 F.3d 695, 699 (D.C. Cir. 1999), "in assessing the effect a prosecutor's remark would have had on a jury . . . we seek to avoid an overly mechanistic application of these criteria by according due respect to the juror's common sense and discrimination," *United States v. North*, 910 F.2d 843, 895 (D.C. Cir. 1990) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1440 (D.C. Cir. 1984)). Courts should be "wary of reversing convictions solely on the ground of a misstatement in a closing argument." *Id.* at 897 (internal quotations omitted).

Keeping in mind that a "prosecutor's statements must be viewed in context," *United States v. Catlett*, 97 F.3d 565, 572 (D.C. Cir. 1996), the court holds that the prosecutor's misstatements were not severe, that he did not engage in improper witness vouching, and that the petitioner has not demonstrated actual prejudice.[3]  The government concedes that the prosecutor's references to Mr. Hart "now" having a criminal record "were, technically, misstatements." Res'p's Opp'n at 13.  In the context of the prosecutor's entire closing argument, however, it is improbable that the jury would have understood these statements as statements of fact that Mr. Hart had no previous criminal history. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974) (cautioning that a court should not lightly infer that a jury will draw the most damaging meaning from a prosecutor's remark in a closing argument); *Monaghan*, 741 F.2d at 1443 (affirming conviction because improper remarks were confined to the closing argument, rather than part of cumulative evidence that the proceeding was driven by prejudice).  The court itself adopted measures to prevent any such inference by the jury by instructing them that the parties' opening and closing statements were not evidence.  Trial Tr. at 130, 133-34, 557-59.

> The prosecutor contends that his line of argument regarding Hart's criminal record was
>
> intended to counter what I expected to be an argument by the defense – that Mr. Hart had little to lose by pleading guilty to the misdemeanor gun charge because he was unlikely to be sent to jail as a result of that plea.  I intended to convey to the jury that irrespective of whether Mr. Hart went to jail, his conviction, and the resulting 'record' of that conviction, could result in certain adverse employment and/or personal consequences.

---

[3] The court also can see no basis for the petitioner's arguments that the prosecutor impermissibly shifted the burden of proof to the petitioner in his closing argument, and that defense counsel improperly assumed that burden. Pet'r's Mot. at 15, 18.  Before closing arguments were given, the court expressly instructed the jury on the burden of proof, tr. at 557-59, and these instructions "would have cured any confusion caused by the prosecutor's remarks." *United States v. Catlett*, 97 F.3d 565, 573 (D.C. Cir. 1996); *United States v. Kim*, 595 F.2d 755, 768 (D.C. Cir. 1979) (holding that instructions by the court can ameliorate any prejudice caused by improper arguments).

Resp't's Opp'n Ex., B. ¶ 17 (Nash Aff.). This explanation coheres with the way the prosecutor

had previously worded this argument earlier in his closing argument – stating that "Mr. Hart

himself ends up with a criminal record *here*," tr. at 598 (emphasis added), suggesting that his

misstatement was more likely a slip than any kind of deliberate attempt to mislead the jury.[4]

Furthermore, the prosecutor directly acknowledged and discussed Mr. Hart's own

criminal violations immediately before his misstatement in his closing argument:

> [n]ow, maybe Mr. Hart doesn't have the best judgment. Certainly, he didn't have
> good judgment when he bought a pistol and he brought it up into his room and he
> put it in his dresser, because we know that's against the law. And he certainly
> didn't have good judgment when he bought a little bag of marijuana and he kept
> that in his bedroom, too, because that's against the law. And maybe he didn't have
> good judgment – and I submit that he himself would admit he didn't have good
> judgment when he let his nephew back in the house after catching him cook up
> crack cocaine in the kitchen. I submit that was very bad judgment as well.

*Id.* at 602-03. Far from describing Mr. Hart as a perfectly innocent and law-abiding citizen, the

prosecutor discussed openly facts that could potentially affect Hart's credibility.

The prosecutor's strategy was to argue to the jury that it was "ludicrous" to believe Mr.

Hart was a practicing crack cocaine dealer (as opposed to someone caught with a small bag of

marijuana) who possessed a semiautomatic assault weapon (as opposed to a handgun) in

furtherance of his drug trade. He based his argument on Mr. Hart's age and several years of

steady and legitimate employment – facts that were relevant to his credibility regardless of the

---

[4] The prosecutor declares that while he was aware that Mr. Hart had been arrested several times in 1967 and in the early 1970s, the criminal history that he had in his possession, Resp't's Opp'n Ex. D) as of August 17, 2000, when Mr. Hart appeared before the grand jury, "did not reveal whether any of these arrests had resulted in convictions." Resp't's Opp'n Ex. B ¶ 8 (Nash Aff.). Thereafter, the prosecutor acquired a full criminal history report on Mr. Hart, which he provided to defense counsel on December 4, 2000. *Id.* ¶ 15. The petitioner refers to several Supreme Court cases for the proposition that the "rudimentary demands of justice" are violated when a prosecutor knowingly allows false evidence to go uncorrected when it appears in a trial. Pet'r's Mot. at 12 (citing, *inter alia*, *Giglio v. United States*, 405 U.S. 105 (1972)). This case presents a different situation, however, because Mr. Hart's false testimony occurred only in his testimony to the grand jury – he gave no testimony as to his prior criminal history at trial. Thus, the petitioner's arguments regarding *United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977), and *De Marco v. United States*, 728 F.2d 1074 (11th Cir. 1991), cases involving perjured testimony at trial, are inapplicable to the factual situation of this case.

existence or nonexistence of a prior criminal history that he accrued roughly thirty years ago, and an argument designed to counter the defense's credibility-damaging cross-examination regarding Hart's cooperation with the government and his own self-interest in testifying. *See United States v. Robinson*, 59 F.3d 1318, 1323 (D.C. Cir. 1995) (holding that prosecutorial statements in support of a witness in a closing argument did not constitute improper vouching when that witness' credibility had been made an issue by the defendant during the trial); *Monaghan*, 741 F.2d at 1439 (stating that "[t]he prosecution cannot be shut off from fair comment on the strength of its own witness's testimony, particularly where . . . that witness has been severely challenged by the defense").

On this record, and in light of the substantial physical evidence implicating the petitioner, the court holds that the prosecutor's misstatements were not severe, that he did not engage in impermissible witness vouching, and that the petitioner has not been prejudiced.

### C. The Petitioner's Ineffective Counsel Claims

#### 1. Legal Standard for Ineffective Assistant of Counsel

To demonstrate ineffective assistance of counsel, the petitioner must show that his counsel's performance was in fact deficient and that the deficient performance prejudiced his defense such that there was "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* at 669. The court must begin with a strong presumption that "counsel's conduct falls within the range of reasonable professional assistance." *Id.* at 689. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an

insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.

The petitioner asserts several claims of ineffective counsel at his trial. For the following reasons, the court holds that the petitioner has not demonstrated that counsel's performance was deficient, or that he was prejudiced by any of the deficiencies alleged.

### 2. Trial Counsel's Failure to Impeach Lawrence Hart did not Prejudice the Petitioner

The petitioner's main allegation of ineffectiveness of counsel involves his defense counsel's failure to impeach Hart with his false testimony to the grand jury. Pet'r's Mot. at 17-21. Although the court denied defense counsel's motion to introduce Mr. Hart's prior convictions as impeachment evidence, the petitioner argues that this "ruling in no way prevented [defense counsel] from impeaching Hart with the fact that he had lied to the Grand Jury about his prior criminal record." *Id.* at 17.

Failure to impeach a key government witness whose testimony is central to the government's case may, in some circumstances, constitute deficient performance that prejudices a defendant. *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (holding that defense counsel's failure to impeach eyewitnesses identifying the defendant at trial as the robber, where defense counsel should have been aware that these eyewitnesses had previously identified a different person, and where the state's case "depended solely on eyewitness identifications [because] there was no physical evidence to connect [the defendant] to the crime," constituted ineffective counsel and prejudiced the defendant). In this case, however, Hart's testimony only helped establish that the guns and cocaine belonged to the petitioner, and that he had previously

seen his petitioner with cocaine. The government relied on strong physical evidence and testimony by law enforcement officials to tie the petitioner to the drugs and firearms.

Furthermore, defense counsel extensively cross-examined Hart regarding his credibility. Through questioning, counsel revealed Hart's cooperation agreement with the government, including the fact that Hart had not been required to plead guilty to a charge involving the marijuana found in his bedroom, that his sentencing date had been continued pending his testimony in this case, and that he knew that the prosecutor's allocution at his sentencing depended on his testimony. Resp't's Opp'n at 21; Trial Tr. at 404-407. Although questioning Mr. Hart about his false answer to the grand jury could have further impeached his testimony, the court concludes that the extensive cross-examination of Hart provided the jury with sufficiently "strong grounds to doubt his credibility." *See United States v. Weaver*, 234 F.3d 42, 48 (D.C. Cir. 2000) (holding that counsel's failure to impeach a witness with questions about his past suicide attempts was not prejudicial to the defendant because the witness had been extensively cross-examined with other credibility-damaging information); *United States v. Duke*, 50 F.3d 571, 580-81 (8th Cir. 1995) (holding, in a § 2255 case, that perjured testimony by a government witness *at trial* about his criminal history did not prejudice the defendant, when defense counsel had impeached the witness' credibility with evidence that he had been paid for undercover work with the DEA and his cooperation in subsequent prosecutions, such that the jury was "well aware of the possibility that self-interest might have influenced [the witness'] testimony").

The petitioner must demonstrate *more* than a "reasonable *possibility* that either a total, or just a substantial, discount of [a witness's] testimony might have produced a different result[.]" *Strickler v. Greene*, 527 U.S. 263, 291 (1999) (emphasis in original). The petitioner has not met

14

this burden. Accordingly, the court holds that this failure did not prejudice the defendant, such that, had the jury been aware of Mr. Hart's grand jury testimony, it is reasonably likely that it would have reached a different verdict.

### 3. Trial Counsel's Failure to Object to the Testimony of Officer Horne Would not have Resulted in Exclusion of the Testimony, and did not Prejudice the Petitioner

The petitioner next claims that his defense counsel was ineffective for failing to object to the testimony of Officer Horne as "inadmissible hearsay." Pet'r's Mot. at 21-23. The petitioner claims that because Officer Norma Horne had "no firsthand knowledge of the exact location" of the items about which she testified, the items themselves and her "summary" testimony should have been excluded.[5] Pet'r's Mot. at 22. The petitioner acknowledges that Officer Horne participated in the execution of the search warrant at the petitioner's home, and that her role was "to be at the rear of the location when the knock and announce was conducted and to act as the seizing officer once entry was gained." *Id.* at 3. Officer Horne "recorded what was seized during the execution of the search warrant on a seizing list" that was admitted into evidence at trial. *Id.* at 4. The petitioner claims, however, that "at no point during her testimony did Horne testify that she personally observed where any of the seized items were actually located when the individual members of the search team located each item." *Id.*

As the respondent points out, however, throughout her testimony, Officer Horne responded to questions from the prosecutor asking her to identify where *she* found items that

---

[5] To support this conclusion, the petitioner refers to *United States v. Kayode*, 254 F.3d 204 (D.C. Cir. 2002), for the proposition that "[t]estimony about the location from which tangible evidence is seized constitutes inadmissible hearsay if the testifying witness did not seize the evidence himself and did not have personal knowledge of the location where each exhibit was found." Pet'r's Mot. at 21. Although similar language exists in the court's opinion, this language appears in that court's description of the *defendant's* arguments regarding the grounds for her appeal. *Kayode*, 254 F.3d at 211. The court announced no rule in *Kayode* requiring police officers who testify at trial to have physically seized each piece of evidence themselves before their testimony may be admitted.

were seized. [6] *See, e.g.*, Trial Tr. at 225-28, 230, 233, 238. Although Officer Horne did not affirmatively *repeat* under questioning that she "went to each room and personally viewed the items at the locations where they were first located by the individual searching officers or that she received the items from the officers at their original locations," Pet'r's Mot. at 4, there is no indication from the record that Officer Horne, who was present for the entire search, did not observe the collection of each item.

More importantly, the petitioner offers no reason or argument why, had counsel raised this objection, it would have resulted in the court ruling Officer Horne's testimony inadmissible. The petitioner does little more than assert the possibility that the chain of custody during the search and seizure was unreliable. Challenges to the chain of custody, however, go to the weight of evidence, not its admissibility. *See, e.g., United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997); *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990); *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988); *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir. 1985); *see also United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004) (stating that "[m]erely raising the possibility of tampering or misidentification is insufficient to render evidence inadmissible") (internal quotation omitted). Rather than deficient, defense counsel's decision not to object to Officer Horne's testimony was more likely based on such an objection's lack of merit, *see United States v. Holland*, 117 F.3d 589, 594 (D.C. Cir. 1997) (finding that counsel was not ineffective for failing to raise a meritless issue). Accordingly, the petitioner was not prejudiced by counsel's failure to bring this objection.

---

[6] For example, when asked by the prosecutor whether the plate from which the defendant's thumbprint was found "appear[ed] to be in the same condition as it was when *you* first found it sitting on the blue chair," Office Horne responded, "no, sir," and affirmed that the "black powder substance that appears on there right now [from the fingerprint analysis] . . . wasn't on the plate at the time that I first saw [the plate]." Trial Tr. at 209 (emphasis added). Officer Horne also described the role of seizing officer as follows: "[o]nce items have been located in the house, your seizing officer is the one who takes actual custody of the items, that is, of course, unless it is something that needs to be printed." *Id.* at 194.

**4. Trial Counsel's Failure to Request Jury Instruction did not Prejudice the Petitioner**

The petitioner next claims that he was prejudiced by his defense counsel's failure to request a jury instruction from the court regarding the elements of proof the petitioner believes is required by 18 U.S.C. § 924(c)(1)(B)(i) to sentence a defendant to the ten year mandatory minimum sentence for possession of a "semiautomatic assault weapon" during and in furtherance of a drug trafficking offense.[7] The court instructed the jury of the definition of the term "firearm" as including "any weapon which will or is designed or can readily be converted to expel a projectile by the action of an explosive." Trial Tr. at 572-74. The court did not,

---

[7]18 U.S.C. § 924(c)(1) states in pertinent part:

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years

(B) If the firearm possessed by a person convicted of a violation of this subsection --

(i) is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

(ii) is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

18 U.S.C. § 924(c)(1).

however, provide a separate definition for the term "semiautomatic assault weapon."[8]  The

petitioner argues that defense counsel was ineffective for failing to request an instruction

informing the jury that the government bore the burden of proving beyond a reasonable doubt

that the Colt AR-15 seized from the petitioner's bedroom was a semiautomatic assault weapon.

Pet'r's Mot. at 25.

To show actual prejudice resulting from a challenged jury instruction, the petitioner must

show that "the ailing instruction by itself so infected the entire trial that the resulting conviction

violates due process." *United States v. Frady*, 456 U.S. 152, 169 (1981) (internal quotation

omitted).  The petitioner's argument rests on a previous and different version of § 924(c)(1) than

that which he was convicted under.[9]  Interpreting a previous version of the statute, 18 U.S.C. §

924(c)(1) (1988 ed., Supp. V), the Supreme Court held in *Castillo v. United States* that the type

of weapon possessed is a separate element of a separate crime that must be proven beyond a

reasonable doubt, rather than a sentencing factor. *Castillo v. United States*, 530 U.S. 120 (2000).

Congress, however, made substantial revisions to § 924(c)(1) in 1998. *Castillo*, 530 U.S. at 124-

---

[8] The petitioner also refers to *Apprendi v. New Jersey* to argue that the type of weapon must be submitted to a jury and proved beyond a reasonable doubt.  Pet'r's Reply at 10; relying on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that "any fact that increases the prescribed penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt")).  *Apprendi* is inapplicable here, however, because convictions under § 924(c)(1) carry a statutory maximum sentence of life imprisonment, regardless of which subsection the defendant is sentenced under.  *See Sandoval*, 241 F.3d at 551 (holding that the classification of a firearm as a semiautomatic assault weapon under § 924(c)(1) does not increase the maximum possible penalty, but raises the mandatory minimum penalty from 5 to 10 years).

[9] The petitioner bases much of his argument on *United States v. Bandy*, 239 F.3d 802, 806 (6th Cir. 2001), which applied *Castillo* to overturn a district court decision that treated a weapon type under § 924(c)(1) as a sentencing factor rather than an element to be proved beyond a reasonable doubt.  *Bandy*, however, involved the previous version of § 924(c)(1) considered in *Castillo*, and not the version amended in 1998 under which the petitioner was charged.  Although the version of § 924(c)(1) being construed is not clear from the court's opinion, the defendant in *Bandy* was indicted in 1997, before the amendments to § 924(c)(1) were enacted.  Docket, *United States v. Bandy*, 239 F.3d 802 (6th Cir. 2001). At least one other court seems to have made the same mistake as petitioner.

18

125 (stating that "in 1998 Congress reenacted § 924(c)(1) separating different parts of the first sentence (and others) into different sections," and recognizing that the new version of § 924(c)(1) suggested a "contrary interpretation" to the one the court came to). These revisions recast the statutory provision as "defining a single crime with a choice of sentencing penalties based on the presence or absence of various facts, rather than as a statute that defines multiple separate criminal offenses." *United States v. Avery*, 295 F.3d 1158, 1170-71 (10th Cir. 2002); *United States v. Sandoval*, 241 F.3d 549, 551-52 (7th Cir. 2001); *United States v. Harrison*, 272 F.3d 220, 225-26 (4th Cir. 2001).

Whether the petitioner's counsel should have requested a jury instruction that the determination that the firearm was a semiautomatic assault weapon must be proved beyond a reasonable doubt (under an incorrect assumption that *Castillo* still applies to § 924(c)(1) as amended), the petitioner cannot establish that defense counsel's failure to request such an instruction prejudiced him. *Addonizio*, 442 U.S. 178, 185 (1979) (holding that "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice'") (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). The term "semiautomatic assault weapon" is statutorily defined to include a Colt AR-15 rifle. 18 U.S.C. § 921(a)(30)(A)(iv). The gun recovered from the petitioner's bedroom was identified at trial by one law enforcement agent as an AR-15 rifle made by Colt Industries, Trial Tr. at 284, and by another as a "Colt AR-15 A2, the Model Sporter 2 . . . [i]t is a .223 caliber semi-automatic rifle[,]" Trial Tr. at 349. No evidence to the contrary is alleged here by the petitioner. *See Neder v. United States*, 527 U.S. 1, 19 (1999) (finding that the omission of an element from jury instructions was harmless "where [the] defendant did not, and apparently could not, bring forth facts contesting the omitted element").

19

Accordingly, there is no reasonable probability that there would have been a different result had defense counsel requested a different jury instruction.[10]

### 5. Petitioner's Counsel's Failure to Argue that the Government did not Prove that the Defendant Possessed the Weapon in Furtherance of a Drug Trafficking Offense did not Constitute Ineffective Assistant and did not Prejudice the Petitioner

The petitioner next argues that defense counsel was ineffective for not arguing that the evidence presented at trial failed to establish that the Colt AR-15 was possessed "in furtherance" of drug trafficking under 18 U.S.C. § 924(c)(1)(B)(i). Pet'r's Mot. at 26. The factors relevant to concluding whether a firearm is possessed "in furtherance of" a drug trafficking crime include "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir. 2000); *see also United States v. Wahl*, 290 F.3d 370, 376 (D.C. Cir. 2002) (applying the *Ceballos-Torres* factors). These factors are meant to help "distinguish possession in furtherance of a crime from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard." *United States v. Gaston*, 357 F.3d 77, 83 (D.C. Cir. 2004) (quoting *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001).

The petitioner asserts that the government failed to meet its burden of proving that the petitioner knew the weapon was present, and notes that, "[o]n the contrary here, Hart testified

---

[10] The petitioner also briefly asserts that defense counsel's failure to request a unanimity instruction enabled the jury to wrongfully convict the petitioner on counts regarding both of the firearms "without deciding which of the two [] guns he possessed." Pet'r's Mot. at 26 n.3. A unanimity instruction is required only when there is a "genuine risk of juror confusion or of conviction resulting from different jurors concluding the defendant committed different acts." *United States v. Sayan*, 968 F.2d 55, 65 (D.C. Cir. 1992). Because both firearms were found in the petitioner's bedroom, there was no such risk of confusion, and the petitioner suffered no prejudice as a result.

that he never saw the defendant with the charged weapons or even saw them at all in the house."
Pet'r's Mot. at 26; Trial Tr. at 397-98. The fact that Mr. Hart had never seen the gun or the
petitioner with the gun is far from dispositive of whether the petitioner knowingly possessed it,
however, and the cases petitioner references are distinguishable. *See United States v. Wade*, 318
F.3d 698, 703 (6th Cir. 2003) (holding that evidence was insufficient to show possession of a
weapon "in furtherance of" drug trafficking where the defendant, who lacked substantial
experience in the drug trade, could not have reasonably known or foreseen that a co-conspirator
carried a gun in connection with drug transactions); *United States v. Lawrence*, 308 F.3d 623,
630 (6th Cir. 2002) (holding that evidence was *sufficient* to show possession of weapons "in
furtherance of" drug trafficking where those weapons were in close proximity to drugs and were
either loaded or with ammunition; holding evidence was *insufficient* regarding one machine gun
that was more likely kept as a "trophy or quasi-souvenir," and which was found unloaded and
wrapped in newspaper with no ammunition "either at hand or on the premises").

Furthermore, the government presented ample evidence connecting the two guns found in
the petitioner's bedroom and the trafficking of drugs, and the petitioner has offered no evidence
or argument remotely suggesting that either gun was more akin to a "trophy or quasi-souvenir"
than a dangerous assault weapon kept in furtherance of drug dealing. Both the Colt AR-15
semiautomatic rifle and the Cobray nine-millimeter semiautomatic pistol were found loaded and
easily accessible in a duffel bag at the end of the petitioner's bed, and more than $3,000 in cash
was recovered from the same bedroom. The crack cocaine rock and ziplock bags filled with
cocaine base, which the jury determined belonged to the petitioner, were located in the same
house in which that these weapons were kept. These facts are sufficient for a reasonable juror to
conclude that the petitioner possessed both firearms in furtherance of drug trafficking. *United*

*States v. Wahl*, 290 F.3d 370, 376-77 (D.C. Cir. 2002) (holding that evidence was sufficient for a reasonable juror to conclude that a loaded firearm was possessed in furtherance of drug trafficking under §924(c)(1) where the firearm was found in the defendant's bedroom in close proximity to 5.6 grams of cocaine and a small amount of money); *See United States v. Gaston*, 357 F.3d 77, 83 (D.C. Cir. 2004). Accordingly, counsel was not ineffective for failing to make this argument, and the petitioner was not prejudiced by this omission.

### 6. The Petitioner's Remaining Claims of Ineffective Counsel Fail

Finally, the petitioner argues that the defense counsel was ineffective in failing to object to the court's Federal Rules of Evidence 404(b) instruction to the jury regarding evidence of prior bad acts. Pet'r'sMot. at 27. This argument is meritless. Defense counsel's failure to object to the court's jury instruction did not prejudice the defendant for the reasons set forth in *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (noting that a bad acts jury instruction could "sufficiently protect a defendant's interest in being free from prejudice") (internal quotation omitted). During Cassell's trial, the court twice instructed the jury that the indictment was not evidence, Trial Tr. at 123, 569-70.

### D. The Court Denies The Petitioner's Request for a § 2255 Hearing

Section 2255 provides that hearings shall be granted "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *see also Sayan*, 968 F.2d 55, 66 (D.C. Cir. 1992) (holding that this rule is "especially applicable if the same judge who tried the case rules on the section 2255 motion"). The petitioner's motion raises two separate claims for relief -- prosecutorial misconduct and ineffectiveness of counsel – both of which are without merit. *See United States. v. Rashad*, 331 F.3d 908 (D.C. Cir. 2003) (holding that a hearing is unnecessary for ineffective assistance of

counsel claim if the record conclusively shows that the petitioner is entitled to no relief) (citing *United States v. Fennell*, 53 F.3d 1296 (D.C. Cir. 1995); *Weaver*, 234 F.3d at 45 (holding that a hearing is not required for a claim of ineffective assistance of counsel where the court determines that the alleged deficiencies in representation did not prejudice the petitioner). Under these circumstances, no evidentiary hearing is necessary under § 2255, nor would one be fruitful.

## IV. CONCLUSION

For the foregoing reasons, the petitioner's motion to vacate, set aside, or correct his sentence pursuant to 18 U.S.C. § 2255, and his request for a hearing, are denied. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 19th day of July, 2006.

Ricardo M. Urbina
United States District Judge